# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**WILL EVANS,**

              **Plaintiff,**

-vs-                                                               **Case No. 6:08-cv-120-Orl-31KRS**

**FLORIDA TRANSPORTATION**
**SERVICES, INC.,**

              **Defendant.**

_____

# ORDER

This matter comes before the Court on the Motion for Summary Judgment (Doc. 31) filed by the Defendant, Florida Transportation Services, Inc. ("FTS"), the response (Doc. 35) filed by the Plaintiff, Will Evans ("Evans"), and the reply (Doc. 42) filed by FTS.

**I.    Background**

Evans, a stevedore and baggage handler, was hired by FTS in June 2000. Evans was employed by FTS primarily in Port Canaveral, but occasionally at Port Everglades. Evans, who continues to be employed by FTS, is paid an hourly wage by FTS and receives gratuities from passengers.

Evans, who is black, filed a charge of racial discrimination with the EEOC in January 2007. He filed the instant suit on November 26, 2007, asserting hostile environment and disparate treatment claims under both 42 U.S.C. § 1981 and Title VII. He also alleged that he had been retaliated against, in violation of both Section 1981 and Title VII, for filing his charge of discrimination with the EEOC.

**II.     Standards**

   **A.     Summary Judgment**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Whether a fact is material depends on the substantive law of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If there is an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof, that party must "go beyond the pleadings and by . . . affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Summary judgment is mandated against the non-moving party who thereafter fails to present sufficient evidence to establish a genuine issue of fact for trial. *Id.* at 322, 324-25. As a general rule, inadmissible hearsay cannot be considered on a motion for summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (citing cases).

In this review, the Court must consider all inferences drawn from the underlying facts in a light most favorable to the non-moving party, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. If an issue of material fact exists, the court must not decide it, but rather, must deny summary judgment and proceed to trial. *Environmental Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).[1]

---

[1] All decisions of the Fifth Circuit prior to October 1, 1981 are binding precedent on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

### B. Direct Versus Circumstantial Evidence

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, prohibits discrimination on the basis of race, color, religion, sex, or national origin. More specifically, that section makes it illegal for an employer to "fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." To establish a Title VII discrimination claim, a plaintiff must present proof of discriminatory intent through either direct or circumstantial evidence. *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000). "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Id.* (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)). In regard to comments, for instance, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (internal citation and quotation omitted). Comments or conduct falling short of this mark are, at best, circumstantial evidence. *See id.*

Both Title VII and Section 1981 "have the same requirements of proof and use the same analytical framework." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (explicitly addressing only plaintiff's Title VII claim with the understanding that the analysis also applied to plaintiff's Section 1981 claim).

### C. Disparate Treatment

Disparate treatment exists when similarly situated workers are treated differently even though they have committed similar acts. *Osram Sylvania, Inc. v. Teamsters Local Union 528*, 87 F.3d 1261, 1265 (11th Cir. 1996). In a case where there is no direct evidence of disparate treatment, a court is to analyze whether summary judgment is appropriate under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under that framework, the plaintiff first bears the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *Wilson*, 376 F.3d at 1087. A plaintiff establishes a prima facie case of disparate treatment by showing that he was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class. *Id.*

For purposes of a disparate treatment claim, not all conduct by an employer that negatively affects an employee constitutes adverse employment action. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001) An adverse employment action is one that results in a "serious and material change in the terms, conditions, or privileges of employment." *Id.* The employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances. *Id.* at 1239.

When the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id.* The employer need not persuade the court that it was actually motivated by the proffered reason. *Id.* If the

proffered reason might motivate a reasonable employer, the presumption of discrimination is rebutted. *Id*. The plaintiff must meet any such proffered reason head-on, rather than quarrel with its reasonableness, and prove that it is a pretext – *i.e.*, that the proffered reason did not honestly motivate the employer. *Id. See also Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (holding that, regardless of whether the proffered reason is unfair, heavy handed, or based on erroneous facts, the inquiry is limited to whether the employer "gave an honest explanation of its behavior.") (internal citations omitted).

### D. Hostile Work Environment

A hostile work environment claim under Section 1981 is established by proof that the workplace "is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harrington v. Disney Regional Entertainment, Inc.*, 276 Fed.Appx. 863, 870 (11th Cir. 2007) (internal citations and quotations omitted). A hostile work environment claimant must show:

(1) that he belongs to a protected group;

(2) that he has been subject to unwelcome harassment;

(3) that the harassment must have been based on a protected characteristic of the employee, such as national origin;

(4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and

(5) that the employer is responsible for such environment under either a theory of vicarious or direct liability.

*Id.* The "severe and pervasive" requirement has both objective and subjective components: The employee must subjectively perceive the harassment as severe enough to alter the conditions of employment and this perception must be objectively reasonable. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). Four factors should be considered when evaluating the objective severity of the harassment:

> (1) the frequency of the conduct;
>
> (2) the severity of the conduct;
>
> (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and
>
> (4) whether the conduct unreasonably interferes with the employee's job performance.

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 584 (11th Cir. 2000).

### E. Retaliation

To establish a *prima facie* case of retaliation under Title VII, the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). The type of conduct actionable under a retaliation claim is broader than the type of conduct actionable under a discrimination claim. Such conduct need not adversely affect the plaintiff's conditions of employment or employment status; rather to be actionable under a retaliation claim, the conduct need only have a "materially adverse" effect on the plaintiff, irrespective of whether it is employment or workplace-related. *Id.* at 973. In the context of a Title VII retaliation claim, a materially adverse action is one that "might have dissuaded a reasonable

worker from making or supporting a charge of discrimination." *Burlington Northern and Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

To establish a causal connection between the protected conduct and the adverse action, a plaintiff must show that the decisionmakers were aware of the protected conduct and that the protected activity and the adverse action were not "wholly unrelated." *Gupta*, 212 F.3d at 590. For purposes of a *prima facie* case, close temporal proximity may be sufficient to show that the protected activity and adverse action were not wholly unrelated. *Id.*

To recover for retaliation, a plaintiff need not prove the underlying claim of discrimination that led to his protest, so long as he had a reasonable good-faith belief that the discrimination existed. *Id.* Once the prima facie case is established, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action. *Id.* As with a Title VII discrimination claim, the employer's burden is "exceedingly light." *Id.* The plaintiff must then demonstrate that the employer's proffered explanations are a pretext for retaliation; the burden of production shifts, but the burden of persuasion remains with the plaintiff. *Id.* The Court must keep in mind that Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace. *Id.* The determination must be made on a case-by-case basis, using both a subjective and objective standard. *Id.*

### III.  Application

In his response to the motion for summary judgment, Evans details numerous incidents of alleged mistreatment. Some incidents are discussed singly, and some are combined with other incidents to create new categories of alleged mistreatment. Many of the incidents are discussed at multiple points in the response, under different analyses. It is not always clear which incidents are

intended to show that Evans suffered disparate treatment, which are intended to show that Evans was subjected to a hostile working environment, and which are intended to fall into both categories.² In an abundance of caution, the Court will assess every incident both as a potential instance of disparate treatment and as potential evidence of a hostile work environment.

**A.     Disparate Treatment**

Evans has no direct evidence of discrimination, and therefore the Court analyzes his disparate treatment claim under the *McDonnell Douglas* framework. At least for purposes of the instant motion, FTS does not dispute that Evans was a qualified member of a protected class. However, FTS argues that Evans cannot establish a *prima facie* case either because he lacks evidence that FTS treated employees outside Evans' class more favorably than it treated Evans, or because the actions of which he complains were not adverse employment actions, or both.

1.     Header promotions

Evans contends that on two occasions, FTS promoted white porters instead of him to the position of "header," which would have resulted in a 50-cent hourly raise. (Doc. 35 at 9-10). However, Evans did not mention these promotions in his complaint or his charge of discrimination, and FTS contends he did not mention them in his discovery responses. Even assuming it is proper to consider this allegation at this stage of the proceedings, the Court finds it is not enough to establish a *prima facie* case of disparate treatment.

---

²For instance, Evans recounts several incidents as evidence that he was subjected to a hostile work environment, then states that "similarly situated white coworkers" were not forced to endure such treatment, which suggests the incident also might form the basis for a disparate treatment claim.

The evidence supporting this allegation consists of passages from Evans' affidavit and from the deposition testimony of Robert Arnold, an FTS porter.[3] In his affidavit, Evans describes an incident in October 2007 where he was bypassed for promotion in favor of William Bowler; Arnold mentions an (undated) incident where Evans was bypassed in favor of Robert Pettigrew. The individuals who received the header promotions are described as white, but there is no evidence that Bowler and Pettigrew were similarly situated to Evans. For example, both Evans and Arnold opine that Evans was sufficiently qualified for the header position, but there is no evidence (or even discussion) as to what those qualifications consisted of, and no evidence as to the qualifications possessed by Bowler or Pettigrew. These conclusory allegations are not enough to support a disparate treatment claim.

2.   Cortisone shot

Evans asserts that FTS deviated from its "liberal medical leave policy" for white porters by refusing to allow him to return to work from an emergency visit to a doctor for a cortisone injection, and that this refusal prevented him from earning wages and tips. (Doc. 35 at 10). In his affidavit, Evans contends that "FTS never treated any of my white coworkers so badly, such as refusing to allow them back to work after having to obtain medical treatment." Again, the "evidence" that similarly situated white employees received better treatment is entirely conclusory. Evans does not even name any such employees, much less provide evidence that they were allowed to return to work under similar circumstances. This is not enough to support an allegation

---

[3]Evans also cites a passage from a deposition by someone named "Ford" as supporting this allegation, but the Court finds no such transcript in the record. (Doc. 35 at 5).

that similarly situated white workers were treated more favorably than Evans was, and Evans offers nothing else.[4]

3. Cell phone

Evans was suspended from his job for a week for "using a cell phone and/or telling [his supervisor, Rodney Cantrell] 'Leave me the hell alone!'" when Cantrell confronted him about the cell phone use. Evans admits that the use of cell phones is not allowed at work, but contends that the policy is widely ignored and that white porters were not disciplined for the same conduct for which he was suspended. (Doc. 35 at 10). In his affidavit, Evans asserts that Cantrell saw three white workers using cell phones but did not say anything to them, and identifies a fourth white worker who shouted back when told to get off his cell phone but was not disciplined. (Doc. 36-8 at 10). Again, Evans provides no evidence that the employees were similarly situated in terms of their job duties, previous disciplinary record and so forth, and there is no showing that they engaged in the same conduct as Evans. None of the four white employees was alleged to have directed a directed profanity at a supervisor, as Evans did.

4. Tardiness

According to Evans, FTS refused to allow him to work when he was late, but allowed white porters to work when they arrived late. (Doc. 35 at 10). In his affidavit, Evans identifies a single incident when he was told to go home for being late. (Doc. 36-8 at 9). He also contends that white coworkers were permitted to work despite being 7 minutes late in one case and 19

---

[4] In his response, Evans cites to the deposition of former FTS port manager Charles Edward Malone as supporting this allegation (Doc. 35 at 4), but the cited passage deals with security restrictions at the port, not doctor's visits.

minutes late in two other cases, and that it is "common practice" for FTS to allow white porters to walk in late. (Doc. 36-8 at 9). Again, however, there is no evidence from which a reasonable jury could conclude that these other employees were similarly situated to Evans. There is no indication as to how late Evans was when he got sent home, and there is no evidence as to the surrounding circumstances, such as how often Evans or the white porters had been late on previous occasions. In addition, Evans never indicates that he has personal knowledge of the tardy white employees who were allowed to work. The wording of his affidavit suggests he is relying on hearsay to make that allegation.

    5.    <u>Timesheets</u>

Evans alleges that FTS tried to cheat him on his time sheets by having one or more of his supervisors do such things as sign him in late, or not at all. (Doc. 35 at 10). However, Evans does not allege that he was actually cheated out of any money that was due to him (or provide any evidence that his supervisors were actually trying to cheat him, rather than simply making mistakes). As such, this conduct would not rise to the level of an adverse employment action. In addition, Evans does not provide any evidence that similarly situated white employees were treated more favorably in regard to their timesheets.

    6.    <u>Leave</u>

Evans contends that he was not permitted the same leave privileges as white employees, in that FTS sometimes refused to allow him to take time off for things such as taking classes or other jobs, while white employees were granted leave for such things. (Doc. 35 at 10). Evans also complains that FTS often manipulates his schedule intentionally to interfere with his part-time job and with his college classes. (Doc. 35 at 19). In support, Evans recites numerous incidents where

he was not allowed take time off and lists numerous white employees who were allowed to take time off. However, Evans' conclusory allegations again fall short of supporting a contention that similarly situated white employees were treated better than he was. For example, Evans attests that

> In or around August 2007, I requested to take two half Sundays off to perform in a volunteer play (matinee) for the community. I was required by FTS to take off a full day both times, and use vacation time to do so. I had wanted the option like my white coworkers, such as Mark Fairhurst, and leave on a half day without sacrificing the morning debarkation chances of making money, but FTS refused.

(Doc. 36-8 at 7-8). Evans does not provide any other information regarding this alleged incident of discrimination, such as what Fairhurst's duties were, what he wanted off for or when, and so forth. Evans' other allegations are similarly lacking in details. No reasonable jury could rely on them to find that similarly situated white employees were treated better than Evans in regard to leave requests.

    7.    <u>Dry Dock Incident</u>

On a day when FTS was working on a ship that was in dry dock, Evans approached a supervisor, Clint Hodge, and asked him about the bonus he might receive for working that day. In his affidavit, Evans contends that Hodge responded by yelling "Fuck you!" and then, after Evans stared at him, reinforced the curse by saying "Exactly!". (Doc. 36-8 at 6). Evans states that "Hodge did not curse or otherwise attack the two white coworkers *who I was told* later asked him the same question." (Doc. 36-8 at 6) (emphasis added). This inadmissible hearsay is not enough to establish that Evans was treated less favorably than similarly situated white employees on this occasion, and Evans offers nothing else.

8. <u>Unequal Discipline</u>

Evans contends that FTS imposed much harsher discipline on him than it did on similarly situated white employees. (Doc. 35 at 3). Evans contends that when he was accused of soliciting a tip, he was fired, while the white porter who actually solicited the tip was not disciplined. (Evans admits he was reinstated by FTS two days later, with pay, though he complains he was not reimbursed for the tips he would have earned, only his hourly wage.) Evans' evidence regarding the other white porter consists entirely of hearsay, however.

As part of his complaints regarding unequal discipline, Evans also asserts that he was disproportionately disciplined by being forbidden to return to work after receiving the cortisone injection discussed *supra*, by being suspended as a result of the cell phone incident with Cantrell, and by being disciplined for tardiness where white employees were not. (Doc. 35 ast 12-13). As discussed above, Evans fails to present any evidence from which a reasonable jury could conclude that similarly situated white coworkers were treated better than he was with regard to these incidents.

9. <u>Onerous conditions</u>

Evans argues that FTS scrutinized his conduct more strictly and imposed more onerous terms and conditions on his employment than it did with similarly situated white co-workers. (Doc. 35 at 17). Evans reiterates several complaints addressed *supra*, including the incident where he was fired after being accused of soliciting a tip, the allegedly stricter standards regarding tardiness and leave requests, and the attempts to manipulate his time sheets. Evans also complains that FTS assigned white employees to drive forklifts "to maximize the comfort level of the white drivers" while allowing him to drive only when bad weather or other conditions made it

undesirable for the white employees to do so. (Doc. 35 at 17). Evans also complains of "unfair and onerous conditions" imposed on him as to the offloading of buses. (Doc. 35 at 17). However, the evidence he cites to – his own affidavit (Doc. 36-8 at 9-10) and one sentence from a the declaration of a former co-worker (Doc. 36-10 at 1) – does not even list any conditions imposed on him that were not imposed on similarly situated white workers, much less provide enough evidence to support such a contention.

      10.     Training and Certification

In 2006, according to Evans, he was denied opportunities for training and certification as a forklift operator. (Doc. 35 at 18). In his affidavit, Evans states that FTS did provide such opportunities to "similarly situated white coworkers." (Doc. 36-8 at 2). Evans also attests that one of his supervisors "told white coworkers to sign up [for a 2006 forklift certification course] and kept me unaware of the enrollment." (Doc. 36-8 at 8). However, Evans only identifies one coworker – Joy Hall – who took any such course, and provides no evidence from which a reasonable jury could find that she was similarly situated to Evans. In addition, Evans provides no evidentiary basis for his contention that his supervisor kept the information from him while sharing it with his white coworkers. All he states is that the supervisor told Hall she needed to take the certification course (Doc. 36-8 at 8), with no explanation of the circumstances leading up to that conversation. Evans also does not provide any information about other white coworkers who were informed of these training or certification opportunities, such as their names, the dates and methods by which they were informed, or anything else that would move Evans' contentions about missed training opportunities beyond the realm of sheer speculation.

11. Demeaning speech

According to Evans, he was routinely spoken to in a harassing and derogatory fashion by his supervisors, whereas white porters were not. (Doc. 35 at 19). This demeaning speech includes the Dry Dock incident, as well as an incident, some time after Evans filed his EEOC complaint, where FTS's port manager shouted at Evans "I can't believe you're accusing me of being unfair to you!" (Doc. 35 at 19). Even if this speech were harsh enough to constitute an adverse employment action, Evans presents no evidence from which a reasonable jury could conclude that similarly situated white workers were treated more favorably than he was treated – i.e., that they were never shouted at or addressed in a harassing or derogatory fashion by their superiors.

**B.    Hostile Work Environment**

Evans' hostile work environment claim warrants less discussion than his disparate treatment claim. The incidents discussed above, even if true, do not demonstrate that Evans' workplace was "permeated with discriminatory intimidation, ridicule, and insult," and they certainly were not severe enough or pervasive enough to alter the conditions of Evans' employment and create an abusive working environment. The vast majority of the incidents cited by Evans – *e.g.*, the refusal to allow him to return to work after the cortisone shot or when he was tardy, the suspension for telling a superior to leave him the hell alone, the (subsequently corrected) problems with his time sheets, the failure to grant him all the leave time he sought – are at worst inconveniences, not intimidating or insulting, and there is no evidence (aside from inadmissible hearsay or Evans' speculation) that the incidents were motivated by discriminatory animus. The few incidents that might cross the line, such as the Dry Dock incident, are neither severe enough nor widespread enough to sustain a hostile environment claim.

### C.     Retaliation

It is undisputed that Evans engaged in statutorily protected activity (filing a claim of discrimination with the EEOC) in early 2007. Evans contends that he was retaliated against for doing so. However, the evidence he has produced is not enough to raise a genuine issue of material fact on this score.

Evans argues that after he filed his claim, FTS began "treating me even worse and with more hostility than [it] had done before I filed the EEOC complaint." (Doc. 36-8 at 2). Evans also states, without further explanation, that after filing his complaint, he was ostracized and denied overtime opportunities, and requests he made for leave or to use vacation days were denied. (Doc. 35 at 8). Without more, these conclusory statements are not enough to sustain a retaliation claim, and Evans offers nothing else in regard to them.

As mentioned above, Evans also states that, a few months after he filed the EEOC claim, one of his supervisors shouted – in a "heated and threatening" manner – "I can't believe you're accusing me of being unfair to you." Evans does not explain the context of the statement, which is too minimal to constitute an adverse employment action.

Finally, Evans also states that he was denied a promotion to header after filing the EEOC claim. (Doc. 35 at 8). Evans offers no evidence that the failure to promote was a result of his filing of the EEOC claim. Evans does not even include the date on which he was passed over, which precludes him from even arguing that temporal proximity shows that the filing caused the failure to promote.

**IV.   Conclusion**

Having carefully reviewed the evidence supporting Evans' allegations of discrimination and retaliation, for the reasons discussed above the Court finds it insufficient to support his claims that he suffered disparate treatment, was subjected to a hostile work environment, or was retaliated against for complaining to the EEOC.  (Any allegations of racism from Evans' papers not discussed explicitly above are found to be without merit and not worthy of discussion.) Accordingly, it is hereby

**ORDERED** that the Motion for Summary Judgment (Doc. 31) is **GRANTED.**  The case is **REMOVED** from the April 2009 trial term, and the Final Pretrial Conference scheduled for March 16, 2009 is **CANCELED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on March 11, 2009.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party